IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SAMUEL KING,<br><br>               Petitioner,<br><br>v.<br><br>ALFRED C. BIGELOW,<br><br>               Respondent. | MEMORANDUM DECISION & ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS<br><br>District Judge David Nuffer<br><br>Case No.  **2:13-CV-985 DN** |

Before the Court is Petitioner's habeas-corpus petition. (Docket Entry # 4.) Having carefully reviewed the parties' pleadings and arguments, the Court concludes that Petitioner is not entitled to habeas relief. The Court therefore denies the petition. The Court also agrees with Respondent that Petitioner's extra-record proffers are ineligible for consideration.

## I.  INTRODUCTION

Together with Jackie, Petitioner kidnaped and assaulted the victim, who suffered from chronic drug addiction, drug-related psychosis, and other mental illnesses. A jury convicted of Petitioner of aggravated assault and kidnaping. In a published opinion, the Utah Court of Appeals affirmed the conviction, *State v. King*, 2012 UT App 203, 283 P.2d 980, and the Utah Supreme Court denied a writ of certiorari, *State v. King*, 288 P.3d 1045 (Utah 2012).

Petitioner now seeks federal habeas relief. His petition asserts five ineffective-assistance-of-counsel claims: failures to (1) get the victim's mental-health records to use as exculpatory evidence; (2) consult a mental-health expert about the victim; (3) raise proper objections about Detective Gordon's testimony as to her interview with Jackie; (4) address the exculpatory

potential of the detective's lying and coercive interview techniques with Jackie; and, (5) address timing and surfacing of, and inconsistencies in, the second interview transcript of Jackie's interview with the detective.

Claims one and two were exhausted by presentation to the state high court.  Still, Petitioner fails to show a basis for habeas relief as to these: He does not show that the Utah courts' merits decisions (1) contradicted or unreasonably applied controlling United States Supreme Court authority, or (2) relied on an unreasonable determination of the facts.

As to claims three, four, and five, he did not present them to the state high court, and the post-conviction statute of limitations would now bar him from doing so.  Those claims are thus technically exhausted, but procedurally defaulted, and barred from merits review in this Court.

**State district-court proceedings.** Petitioner moved for access to the victim's records from Valley Mental Health. R30-31.[1] He later filed an amended motion seeking her mental-health records from the Storefront and Safe Haven programs as well as records involving her medications. R33-34. After the State objected, Petitioner submitted another motion for an order compelling Valley Mental Health to produce records about the victim's diagnosis and treatment as to probation for an assault conviction. R43-47, 50-51. The motion also sought information about bank records and specific medication prescribed for the victim. R50-51. The motion alleged that such information was relevant because it regards "[the victim's] credibility." *Id.* The State objected to this additional motion, arguing the records were privileged and did not hold evidence favorable to Petitioner. R54-60. The court sought more briefing and scheduled oral argument.  R64-66; R148:4-8.

---

[1] These record numbers refer to the "Bates stamp numbers," as the record was certified for appeal by the state district court. The numbers were inserted by Respondent.

Three weeks later, Petitioner moved the court to strike oral argument and set the case for pre-trial conference. R67-68. Counsel explained that his further research showed that the defense could not "meet the admissibility requirements regarding the alleged victims [sic] medical and bank records." R67; R149:3. The judge granted the motion and held trial. R69, 70-95.

After trial, the jury convicted Petitioner as charged. R96-98. Petitioner timely appealed.

**Proceedings in the state court of appeals.** Before filing his opening brief, Petitioner filed a motion under Utah Rule of Appellate Procedure 23B, for a remand to develop evidence supporting his claims of ineffective assistance.  He contended "trial counsel was ineffective in failing to obtain an expert witness and failing to discover medical records." *State v. King*, No. 20091086, slip op. at 1 (Utah Ct. App. Oct. 21, 2010).  Petitioner submitted, with his motion, two affidavits purporting "facts not fully appearing in the record on appeal" and showing the asserted ineffectiveness.  *See* Utah R. App. P. 23B(b).

The court of appeals held that the motion did not meet the prejudice requirement for a remand because the information sought was "cumulative impeachment evidence regarding the victim's general credibility," which was "not likely to have resulted in a different outcome" in light of the remaining evidence supporting her testimony.   *King*, No. 20091086, at 1.

On direct appeal in the court of appeals, Petitioner raised four ineffective-assistance claims. He argued that trial counsel was ineffective (1) "because the failure to obtain a mental health expert witness prevented counsel from investigating Victim's mental illness"; (2) "in failing to seek discovery of Victim's mental health files"; (3) "for failing to object to testimony from Detective about Jackie's statements during her first interview"; (4) and "by not objecting to

Detective's testimony concerning Jackie's statements during the second interview." *King*, 2012 UT App 203, ¶¶ 18, 31, 35, 48.  The court of appeals rejected these claims.  *See id.* ¶58.

**Proceedings in Utah Supreme Court.** Petitioner petitioned for writ of certiorari in the Utah Supreme Court.  *See generally* Respondent's Exhibit A.  Here, he asked the court to review his claims only as to counsel's decisions to not seek the mental-health records and to not consult a mental-health expert.  Respondent's Exhibit A at iii-iv.  The Utah Supreme Court denied certiorari.  *State v. King*, 288 P.3d 1045 (Utah 2012) (table).

## II. ANALYSIS

### A. CLAIMS THREE THROUGH FIVE ARE PROCEDURALLY DEFAULTED.

Petitioner says trial counsel should have objected to alleged hearsay statements (claim three); trial counsel should have objected to admitting some of Jackie's testimony due to allegedly coercive interview tactics (claim four); and, appellate counsel should have raised the trial counsel ineffective-assistance claim on timing of, surfacing of, and inconsistencies in the second interview transcript of Jackie's interview with Detective Gordon (claim five). Petitioner did not exhaust these claims because he never presented them to the Utah Supreme Court, either in his petition for certiorari or in a state post-conviction action.  And because state law would now bar him from presenting these claims to state courts, the claims are technically exhausted, but procedurally defaulted under the AEDPA and may not support habeas relief.

As stated, a state prisoner must exhaust his federal claims in state court before he may seek relief in federal habeas review. 28 U.S.C.S. §2254(b) & (c) (2017); *see also Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Miranda v. Cooper*, 967 F.2d 392, 397 (10th Cir. 1992).

And a petitioner whose appeal was decided by the Utah Court of Appeals must seek certiorari review of his federal claims to the Utah Supreme Court to exhaust state remedies. *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992); *see also Ballinger v. Kerby*, 3 F.3d 1371, 1374 (10th Cir. 1993) (holding petitioner must seek discretionary review in state supreme court to exhaust).

When a petitioner raises claims for the first time in his federal habeas petition, but those claims would be procedurally barred if he returned to state court, they are technically exhausted, but procedurally defaulted, cutting off federal merits review.

**1.    Failure to exhaust stems from omitting claims from petition for certiorari.**

The Utah Court of Appeals issued a published decision in Petitioner's case. *King*, 2012 UT App 203. As shown, he then sought certiorari review by the Utah Supreme Court. *King*, 288 P.3d 1045. But he did not ask the Utah Supreme Court to review his ineffectiveness claims about the detective's hearsay statements, coercive interview techniques, or appellate ineffectiveness (current claims three, four and five). Also, Petitioner has not filed a state post-conviction action.

**2.    Technical exhaustion and procedural default.**

Though Petitioner did not fairly present a federal claim to the highest state court, the exhaustion requirement in § 2254(b) "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125-26 n.28 (1982). Therefore, a "habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion" because "there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

But if a petitioner no longer has a remedy in state court because "'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of habeas relief." *Thomas v. Gibson*, 218 F.3d 1213, 1220-21 (10th Cir. 2000) (quoting *Coleman*, 501 U.S. at 735 n.1).

Petitioner's federal claims are defaulted from federal merits review because state law would now bar merits review in state court under state procedural rules. The Utah Post-Conviction Remedies Act (PCRA) "establishes the sole remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies, including a direct appeal." Utah Code Ann. § 78B-9-102(1) (2016). But the right to seek remedy under PCRA is not unlimited: a statute of limitations bars relief after one year from when a cause of action accrues. *See id.* § 78B-9-107. Claims three, four, and five are now barred by the PCRA statute of limitations because more than one year has elapsed since the claims accrued.

And PCRA bars claims that were--or could have been but were not--presented on appeal. *See id.* § 78B-9-106. Petitioner raised current claims three and four on appeal in the Utah Court of Appeals, where they were disposed of on the merits. *See King,* 2012 UT App 203, ¶¶ 35-57. He would thus be barred from getting a second shot at those claims in a post-conviction petition.

PCRA's statute of limitations and procedural bar would preclude relief for claims three, four, and five. In no event, may Petitioner now present them to the Utah Supreme Court for merits review.  Thus, those claims are now technically exhausted and procedurally defaulted for federal habeas purposes.  *See Thomas*, 218 F.3d at 1220-21.

### 3.       No exception to the procedural-default rule.

This Court "may not consider issues raised in a habeas petition 'that have been defaulted in state court on an independent and adequate procedural ground[] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" *Thomas*, 218 F.3d at 1221 (alteration in original) (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998)).

Petitioner's procedural default may be excused only if he shows "'cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Dulin v. Cook*, 957 F.2d 758, 760 (10th Cir. 1992) (quoting *Coleman*, 501 U.S. at 750.) To meet the "cause" standard, Petitioner must show that an objective factor external to the defense kept him from complying with state procedural rules. *Maes v. Thomas*, 46 F.3d 979, 987 (10th Cir. 1995) (citing *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991)). To establish prejudice stemming from procedural default, a habeas petitioner bears "the burden of showing, not merely that the errors at his trial constituted a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Petitioner has not acknowledged the procedural problems with his claims, so he has also not offered any reason to excuse them. Because he fails to show cause for his procedural default, this Court need not consider the defaulted issue. *Maes*, 46 F.3d at 987; *Steele v. Young*, 11 F.3d 1518, 1522 n.7 (10th Cir. 1993).

The fundamental-miscarriage-of-justice exception applies only when a constitutional violation probably has resulted in the criminal conviction of one actually innocent. *Herrera v.*

*Collins*, 506 U.S. 390, 404 (1993); *Watson v. New Mexico*, 45 F.3d 385, 387 n.2 (10th Cir. 1995). Petitioner has not asserted, let alone shown, that a constitutional violation caused him to be convicted of a crime that he did not commit.

Petitioner alleges no cause or prejudice for failing to properly raise his claims in the Utah Supreme Court. Nor does he allege that failure to consider his claims will result in a fundamental miscarriage of justice. This Court therefore denies these claims as procedurally defaulted.

## B.  MERITS REVIEW

### 1.  Standard of Review

The standard of review to be applied in federal habeas cases is found in § 2254, of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which this habeas petition is filed. It states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.S. § 2254(d) (2017). "Subsection (d)(1) governs claims of legal error while subsection (d)(2) governs claims of factual error." *House v Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008).

The Court's inquiry centers on whether the Utah courts' rejection of Petitioner's claims "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C.S. § 2254(d)(1) (2017). This "'highly deferential standard,'" *Cullen v. Pinholster*, 563 U.S.

170, 181 (2011) (citations omitted); *see also Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013), is "'difficult to meet,' because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction." *Greene v. Fisher*, 132 S. Ct. 38, 43-44 (2011) (quoting *Harrington v. Richter*, 562 U.S.86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment))). The Court may not determine whether the court of appeals' or supreme court's decision was correct or whether this Court may have reached a different outcome. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). And, "[t]he petitioner carries the burden of proof." *Cullen*, 563 U.S. at 181.

Under *Carey v. Musladin*, 549 U.S. 70 (2006), the first step is determining whether clearly established federal law exists relevant to Petitioner's claims. *House*, 527 F.3d at 1017-18; *see also Littlejohn*, 704 F.3d at 825. Only after answering yes to that "threshold question" may the Court go on to "ask whether the state court decision is either contrary to or an unreasonable application of such law." *Id.* at 1018.

> [C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*Id.* at 1016. Further, "in ascertaining the contours of clearly established law, we must look to the '*holdings* as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Littlejohn*, 704 F.3d at 825 (quoting *Yarborough v. Alvarado*, 541

U.S. 652, 660-61 (2004) (emphasis added) (alteration in original) (citations omitted)). And, in deciding whether relevant clearly established federal law exists, this Court is unrestricted by the state court's analysis. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("[F]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'") (citation omitted).

If that threshold is overcome, this Court may grant habeas relief only when the state court has "unreasonably applied the governing legal principle to the facts of the petitioner's case." *Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). This deferential standard does not let a federal habeas court issue a writ merely because it determines on its own that the state-court decision erroneously applied clearly established federal law. *See id.* "'Rather that application must also be unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 411). Indeed, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington*, 562 U.S. at 101 (emphasis in original) (quoting *Williams*, 529 U.S. at 410).

This highly demanding standard was meant to pose a sizable barrier to habeas petitioners. *Id.* at 102. Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* It maintains power to issue the writ when no possibility exists that "fair minded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents. It goes no further." *Id.* To prevail in federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was

so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Against this backdrop, this Court now applies the standard of review to this case.

## 2. Applying Standard of Review

### a.   Clearly Established Federal Law

Absent Supreme Court precedent, "a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law." *House, 527 F.3d at 1017*. Even federal circuit opinions do not clearly establish federal law under AEDPA. *See Renico v. Lett*, 559 U.S. 766, 778 (2010) (holding circuit court erred by relying on own precedent to decide whether federal law was clearly established); *Early v. Packer*, 537 U.S. 3, 10 (2002) (stating circuit court decisions "are off the table as far as § 2254(d) is concerned").

Remembering that review is tightly restricted by federal habeas standards, this Court observes that the Utah Court of Appeals selected the correct governing legal principle with which to analyze the ineffective-assistance-of-counsel issue.  *King*, 2012 UT App 103, at ¶¶ 13-15 (citing *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984)). It is the familiar two-pronged standard of *Strickland v. Washington,* 466 U.S. at 668: (1) deficient performance by counsel, measured by a standard of "reasonableness under prevailing professional norms"; and, (2) prejudice to the defense caused by counsel's deficient performance. *Id.* at 687-88.  The prejudice element requires a showing that errors were so grave as to rob the petitioner of a fair proceeding, with a reliable, just result. *Id.* As the standard of review requies, the Court now analyzes whether the Utah Supreme Court's application of *Strickland* was unreasonable.

**b.  Application of Clearly Established Law Contrary or Unreasonable?**

To obtain habeas relief, then, Petitioner must show that the state court (1) contradicted or unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States," or (2) based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.S § 2254(d) (2017). He must also show that the state court's disposition "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Federal habeas relief is rejected "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 102. (citation omitted). He must further show that the Supreme Court had clearly answered the federal question at issue contrary to the way the Utah court did. *Wright v. Van Patten*, 552 U.S. 120, 124-26 (2008). This standard is intentionally "difficult to meet" and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102. It is "exquisitely deferential." *Black v. Workman*, 682 F.3d 880, 891 (10th Cir. 2012).

To succeed on appeal in state court, Petitioner had to prove that counsel's representation was both deficient and prejudicial. *See Strickland*, 466 U.S. at 687-88, 690, 695.  Regarding deficient performance, Petitioner had to prove that specific acts or omissions fell below an objective standard of reasonableness. *Id.* at 687-88, 690.

Citing *Strickland* in its analysis, the state court noted the deference owed to trial counsel when it stated that "trial counsel's performance is presumed to be part of a sound trial strategy…within the wide range of reasonable professional assistance. *King*, 2012 Utah App.

203, ¶ 14 (quotations and citation omitted) (omission in original). Thus, the court stated it "will assume trial counsel acted effectively if a rational basis for counsel's performance can be articulated." *Id.* (quotations and citation omitted). And finally, the "'benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* ¶15 (quoting *Strickland*, 466 U.S. at 686). Defense counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107.

Under this standard, the state court held that Petitioner had not shown ineffective assistance of trial counsel. *King*, 2012 Utah App. 203, ¶58. Because standards under "*Strickland* and § 2254(d) are both 'highly deferential,'" federal review of ineffective assistance claims must be "'doubly' so.'" *Harrington*, 562 U.S. at 105 (citations omitted). The question here is not whether counsel's actions were reasonable--that was the question for the state court. The question for this Court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

A state-court decision is "contrary to" clearly established federal law if it applies a rule contradicting a Supreme Court holding or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). "A legal principle is 'clearly established'...only when it is embodied in a holding of [the United States Supreme Court]." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). For this purpose, Supreme Court holdings "must be construed narrowly and consist only of something akin to on-point holdings." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008).

With this "exquisitely deferential" standard in mind, this Court denies habeas relief. Petitioner may not receive habeas relief on any of his claims because--aside from having defaulted several of his claims in state court--he does not acknowledge, let alone overcome, the double deference owed the state court's merits decision.

### i.   Claim One – Failure to obtain victim's mental-health records

#### • Deficient Performance?

Petitioner first challenged trial counsel's effectiveness for not seeking discovery of the victim's mental health records, arguing that he was entitled to the records because they "exist and contain extrinsic evidence of disorders" affecting the victim's credibility and "her ability to accurately process events." *Id.* ¶ 31. The court of appeals recognized the "'stringent'" test to obtain such materials and defense counsel's explanation that he had investigated the law before concluding he was "'unable to meet the admissibility requirements.'" *Id.* ¶¶ 32-33 (citation omitted). On this record, the court of appeals held that defense counsel's efforts and decision did not amount to deficient performance. *Id.* ¶ 33.

The court also held that, even assuming deficient performance, Petitioner did not establish prejudice. *Id.* ¶ 34. The panel noted that the mental-health information was "cumulative of the evidence presented to the jury about Victim's total disability due to mental illness," including concerns like her "long-term abuse of methamphetamine, drug-induced psychosis, alcohol abuse, and use of drugs and alcohol on the day of the incident, and the testimony from other witnesses of her prior episodes and tendency to be incoherent when abusing drugs and alcohol." *Id.* "The jury also heard that Victim became so confused while at the park that she

mistakenly believed that her mother was dead. This direct evidence of Victim's delusional lapses would be enhanced little by professional diagnoses." *Id.*

This claim is exhausted and not procedurally defaulted. Because the court of appeals rejected this claim on its merits, *see id.* ¶¶18-23, this Court's review must be doubly deferential under AEDPA's strict framework. Petitioner has not overcome the double deference owed counsel's reasoning and fails to show that the court of appeals' ruling violated controlling federal law on deficient performance.

The record shows fair-minded jurists could agree with the Utah Court of Appeals that trial counsel's decision fell within the strong presumption of objectively reasonable performance. Declining to file a futile motion does not fall outside the wide range of reasonable professional assistance. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial.").

Counsel plainly investigated obtaining these records. He filed a motion to get them, an amended motion, and a response to the State's objections. R30, 33-34, 50-51.  And he did not merely drop the ball when he abandoned the discovery motion.  Instead, he withdrew the motion after concluding that he would not win. The record shows the court of appeals was not unreasonable in determining his conclusion was well-considered and objectively reasonable.

At argument on counsel's motion, the trial court was skeptical of Petitioner's discovery request. The court noted that, though it would defer final ruling until after Valley Mental Health's response, it believed the State's objection to be "very compelling at this point." R48:4.

Before the trial court could issue its ultimate ruling, counsel moved to strike the hearing, asserting that, after "researching the law and applying the specific facts in this case," he believed

that the defense could not meet the admissibility requirements for the alleged victim's medical and bank records, as outlined by statute and case law, and that "all the law was against me. So I conceded that point." R149:3.

On the law available to trial counsel, fair-minded jurists could again agree with the Utah Court of Appeals that he reasonably assessed chances of losing. Utah Rule of Evidence 506 creates a privilege for information "communicated in confidence . . . for the purpose of diagnosing or treating" a patient. Utah R. Evid. 506(b). Rule 506(d)(1), allows an exception where the "physical, mental, or emotional condition of the patient … is an element of any claim or defense."

In *State v. Blake*, the Utah Supreme Court explained that the therapist-patient privilege "'reflect[s] good policy choices'" by "'fostering candor in important relationships by promising protection of confidential disclosures.'" 2002 UT 113,¶18, 63 P.3d 56 (quoting Utah R. Evid. 501 adv. cmte. notes). The court then held that, while rule 506 allows discovery of "'exculpatory evidence … which would be favorable'" to a defense, that was a "stringent test" that would require "some type of extrinsic indication that the evidence within the records exists and will, in fact, be exculpatory." *Id.* ¶ 19 (citation omitted). The court then noted that in light of the "'good policy choices'" reflected in the privilege itself, the "difficulty in meeting" the exception "is deliberate." Id. ¶¶ 18, 19 (citation omitted).

In a footnote, the *Blake* court referred to the specific question at issue here: whether a defendant could obtain such records to "impeach[] the victim's testimony." *Id.* ¶19 n.2. While the court did not directly rule on that question, it did note the unlikelihood "that impeachment evidence qualifies as an element of a claim or defense." *Id.*

Then in *State v. Gonzales*, the court seemed to hold that requesting such records for impeachment purposes would *not* satisfy the exception. 2005 UT 72, ¶43. Specifically, the court held that when a defendant "wishes to use [the victim's] mental health records to impeach her credibility as a witness," that would "not actually" be "an element of his defense" as contemplated by the exception. *Id.* Thus, under *Gonzales*, the kind of records Petitioner says trial counsel should have pursued would remain privileged and not discoverable.

Finally, although the supreme court had not yet ruled on *Worthen* at the time of Petitioner's trial, the court of appeals had issued its opinion in *Worthen* earlier that year. *State v. Worthen*, 2008 UT App 23. There, the court of appeals reviewed the supreme court's decisions in *Cardall*, *Blake* and *Gonzales. See generally Worthen,* 2008 UT App 23, ¶¶ 14-18. The court of appeals then distinguished *Gonzales* by drawing a line between therapy records that would constitute "general impeachment evidence," and those that might provide evidence of a specific motive. *Id.* ¶19. Specifically, the court of appeals allowed the defendant in that case to obtain the victim's records precisely because the defendant was "*not* seeking general impeachment evidence to bolster a bald assertion that he did not commit the crime, nor [was] he seeking evidence that would broadly undermine" the victim's credibility. *Id.* Instead, the defendant's request was only permissible under *Gonzales* because the request was "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* (quotations and citation omitted).

Petitioner did not show the state courts that his trial counsel could have met that burden. He has not shown that trial counsel could establish that the records would portray that the victim said anything to her rehabilitation counselors that would have revealed a specific bias, prejudice,

or ulterior motive. Rather, his claim was the exact claim that had been rejected in *Gonzales,* and *Worthen*--that these records could somehow be used to support his "bald assertion that he did not commit the crime," as well as "broadly undermine" the victim's credibility.

In his 23B motion, for example, he contended that evidence of the victim's mental condition would (1) support his claim that he "did not assault or kidnap [her]," and (2) hurt her credibility, showing that she "was influenced or impaired in her perceptions by long-term mental health conditions." Defendant's 23B memo. at pp. 37-38 (Respondent's Exhibit D).

The Utah Court of Appeals was not unreasonable in determining that counsel also reasonably chose to abandon the discovery effort as he could present enough other evidence showing the victim's psychoses and perception and memory deficiencies--including her own admissions on the stand. And that strategy did not depend on wasted efforts chasing after unobtainable records. Counsel may form "a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107.

In short, counsel's assessment of the law, as it existed at that time, was not just reasonable, but correct. Under *Gonzales* and *Worthen,* Petitioner was not entitled to the victim's records. Counsel reasonably chose not to persist with this futile motion. Consequently, the state court of appeals's determination that the counsel performed reasonably was itself not unreasonable and must be respected by this Court.

### • Prejudice?

Neither was the court of appeals' prejudice determination unreasonable. Counsel presented the jury evidence of the victim's "total disability due to mental illness, long-term abuse

of methamphetamine, drug-induced psychosis, alcohol abuse, and use of drugs and alcohol on the day of the incident, and the testimony from other witnesses of her prior episodes and tendency to be incoherent when abusing drugs and alcohol." *King*, 2012 UT App 203, ¶ 34. "The jury also heard that Victim became so confused while at the park that she mistakenly believed that her mother was dead. This direct evidence of Victim's delusional lapses would be enhanced little by professional diagnoses." *Id.* Petitioner argues only that the court of appeals improperly weighed the totality of this evidence. But Petitioner's--or even this Court's-- disagreement is not enough. Petitioner must prove that no fairminded jurist could agree. He has not and cannot show that. The fact that the court of appeals viewed the potential for prejudice differently than Petitioner did proves neither that counsel's performance prejudiced him nor that the court of appeals unreasonably applied *Strickland*.

And the reason for this is that there was never any question that the victim had been treated for these conditions. At trial, she openly acknowledged that she had suffered from depression, meth-induced psychosis, and PTSD. R152:5-6, 52. She openly acknowledged that she taken Zoloft and Trazadone. R152:6. She openly acknowledged that she had used illegal drugs. R152:14. And she openly acknowledged that she had been treated at the Safe Haven clinic for these conditions. R152:56. Despite all this evidence, however, the jury still believed the victim and convicted Petitioner. He has not shown that these records would have revealed anything that the jury did not already know, nor would the records have resolved a controversy. The records could have served only to further embarrass the victim, but would not give any additional or substantively different reason to disbelieve her. Thus, Petitioner did not show prejudice, and the court of appeals' decision was not unreasonable on this record.

ii.  **Claim Two -- Declining to call a mental-health expert**

Petitioner next challenges, as he did in state court, trial counsel's effectiveness for not calling a mental-health expert to opine about the victim's mental health and the effects of drug use. This claim is exhausted and not procedurally defaulted. Because the court of appeals rejected it on its merits, *see King,* 2012 UT App 203, ¶¶ 18-23, this Court's review must be doubly deferential under AEDPA's strict framework.

• **Deficient Performance?**

When he made this claim in state court, Petitioner cited "numerous authoritative sources" describing "the impact of methamphetamine on the brain, including its effects on judgment, learning, memory, emotions, and cognitive ability," which "can lead to 'psychosis,'" particularly when combined with mental illness or other substances. *Id.* ¶19. He argued that expert testimony was needed (1) to establish how combining the victim's mental illnesses and substance abuse would impair her cognitive processes, and (2) to correct the victim's claim that her conditions did not affect her and that she was sober when the crimes occurred. *See id.* ¶ 20. He relied primarily on Utah Rule of Evidence 702 and *State v. Clopten*, a Utah Supreme Court opinion addressing when a defendant is entitled to expert testimony explaining the inherent deficiencies in eye-witness identifications. *See id.* (citing 2009 UT 84).

But the court of appeals explained that, unlike the counterintuitive limitations inherent in eyewitness identification testimony, counsel here had no need "to disabuse jurors of the notion that there is no exacerbating effect when mental illness and long-term drug abuse are combined." *Id.* ¶23. "While expert testimony might have been helpful if offered, we are unwilling to require

that in every case where a key witness suffers from both addiction and mental illness such testimony must be offered." *Id.* The court thus concluded counsel did not perform deficiently. *Id.*

> • **Prejudice?**

The state court also held that counsel's performance did not prejudice Petitioner, because even if counsel had offered the expert testimony at issue, that "testimony would have been primarily cumulative of other impeachment evidence." *Id.* ¶24. In support, the court recited extensive and multifaceted testimony the jury heard about the victim's history of drug abuse, mental illness, and sometimes casual relationship with reality. *Id.* ¶¶ 25-29. It noted that the "lack of an expert did not prevent trial counsel from attacking Victim's credibility vigorously both in cross-examination and during closing argument." *Id.* ¶ 30. Thus, the court was "simply not persuaded that expert testimony on the likely effects of long-term drug abuse would have provided more compelling evidence." *Id.*

A fair-minded jurist could agree with the state court. Counsel's decision not to offer expert testimony was made after researching the victim's mental-health records' discoverability, (*see* Respondent's Exhibit C, Affidavit of Manny Garcia), and was followed by counsel's successful efforts to place the necessary information before the jury in other ways. The decision was reasonable because it gave the jury the necessary information, focusing attention on the victim and undermining her credibility, while minimizing the fact that both Petitioner and Jackie were substance abusers as well and may suffer from the same sorts of problems. R151:93-94, 112; R152:49, 130.

Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Here, trial

counsel's affidavit makes it plain that he made "a reasonable decision" that a "particular investigation[]" into this issue was "unnecessary." *Id.* at 691.  Specifically, counsel explained that, during his pretrial "investigation," he learned of the victim's "mental illnesses and methamphetamine-induced psychoses," as well as her illegal drug use. Garcia Affidavit at ¶¶ 2-5. He also found that the victim had gotten a $26,000 Social Security payment "due to her mental illnesses and psychoses," and that she had "smoked crack cocaine and drank alcohol" on the day of the crimes. Garcia Affidavit at ¶¶ 4-6. Counsel did not consult with an expert on these issues because his "strategy at trial" was to address them in his cross-examination of the victim. Garcia Affidavit at ¶ 10.

The record bears out counsel's recitation of his strategy. The jury heard extensive testimony about the victim's drug and mental-health issues. For example, the jury heard witness testimony, saying that the victim often "says things that just don't make any sense" when she is using alcohol or drugs, that she is "crazy," that she uses cocaine and heroin, and that she has "mental illnesses." R151:128, 159. The jury also heard witness testimony that the victim had been "drinking" and doing drugs on September 25, and that she was "tweaking" by the time they reached the apartment.  R151:128, 143.

The jury also heard testimony from Diana Miller, the victim's friend and former employer, confirming that the victim had "mental problems," as well as that she sometimes smokes crack cocaine. R151:197, 200.

Notably, this testimony was undisputed. Indeed, the jury heard testimony from the victim herself acknowledging that she had been diagnosed with PTSD in 2001, with depression a few years after that, and with a meth-induced psychosis in 2005, as well as that she smoked crack and

drank vodka before being abducted by Petitioner and Jackie on the day of the crimes. R152:5-6, 15, 52-57, 77-78. And the jury heard that the victim's problems were severe enough that she received a $26,000 Social Security disability payment. R152:7-8, 10. Thus, defense counsel did not need an expert to testify about the victim's undisputed drug and mental health problems.

The record suggests another reason why trial counsel could have chosen to not call an expert on this issue: It may have undermined his own client's credibility. The illegal drug use was not confined to the victim; the record showed that Petitioner was a drug abuser too. The victim testified that Petitioner smoked crack cocaine during their relationship, and that they had used some of her Social Security money to buy crack together. R152:49. Petitioner admitted to Detective Gordon that he had smoked crack cocaine on the day of the crimes, and Jackie testified that he had also been drinking vodka that evening. R151:93-94, 112; 152: 130.

The sentencing-proceeding record further details Petitioner's drug issues. It shows that he had a "major problem" with drug abuse. R153:3. He admitted he had "used marijuana, LSD and cocaine" in the past, and he shared that cocaine was his "drug of choice." R125:6. According to the PSI investigator, Petitioner "has used cocaine for years and would best be described as an addict." R125:6.

Petitioner argues that trial counsel was constitutionally obliged to present expert testimony about the effects of this very behavior on a person's cognitive abilities. Among other things, Petitioner asserts, as he did in state court, that counsel should have presented expert testimony that "cocaine abuse" can have "long-lasting and sometimes permanent effects on the brain," and that such effects include altering a person's perception of, ability to recall, and ability to recount events. Defendant's 23B memo., at p. 18. Petitioner also urged in state court, and his

claim here seems to follow suit, that counsel should have presented expert testimony showing that "cocaine used in large amounts or over a significant period of time causes a more intense high, restlessness, irritability, anxiousness, vertigo, and paranoia," as well as a "loss of touch with reality." Defendant's 23B memo., at pp. 19-20.

But if counsel had presented that expert testimony at trial, the State would have been able to use it to attack Petitioner too. Specifically, the State would have been able to argue that, because Petitioner is a cocaine addict who had smoked crack on September 25, he too would have been more likely to engage in paranoid, delusional behavior--like deciding that his girlfriend was "disrespecting" him by giving her money to other people, as well as by then kidnaping and duct-taping her, and demanding that she turn over her disability money to him.

Objectively reasonable counsel could choose to forgo a generalized, expert-based approach that may have implicated his own client, and opt, as Petitioner's counsel did, for a narrower "strategy" that focused exclusively on the victim's particular problems.  To that end, counsel reasonably relied on witnesses who knew her, and who knew about her own particular struggles. And because that approach called the victim's credibility into question without simultaneously implicating Petitioner, it was not just a reasonable alternative to expert testimony, it seems the superior option. *Cullen*, 131 S.Ct. at 1409-10 (recognizing counsel can reasonably forgo expert testimony that can open door to further aggravating evidence against defendant).

A fair-minded jurist could likewise agree with the state court's prejudice decision. It was not unreasonable in recognizing that expert testimony would have been "primarily cumulative of other impeachment evidence" already before the jury. *King*, 2012 UT App 203, ¶ 24. The court of appeals marshaled the "extensive evidence" from the trial about the victim's addictions and

their effect on her as described by others who knew and interacted with her. *Id.* ¶¶ 25-27, 58. The panel also fully explained defense counsel's "vigorous" and "forceful" use of evidence against the victim in both cross-examination and closing. *Id.* ¶¶ 24-30. The opinion's description of the evidence and arguments amply shows that the expert's testimony is not reasonably likely to have "'altered the entire evidentiary picture,'" as Petitioner claimed, because the jury had plenty of information before it with which to evaluate the effect of the victim's mental illness and long-term substance abuse on her ability to accurately perceive and recite. *Id.* ¶¶ 25-30, 46.

And Petitioner's proposed expert would have been expressly prohibited from testifying regarding her "truthfulness on a particular occasion." *State v. Rimmasch*, 775 P.2d 388, 391 (Utah 1989). Thus, while he could have theoretically said that her ability to perceive events was impaired, he could not have said that she was lying or mistaken when she told her story to police. *Id.* Petitioner's claim fails for this reason alone, because the jury would still have been justified in believing the victim despite any expert testimony.

Further, expert testimony about the victim's cognitive impairments would not have tipped the scales for Petitioner. The record actually shows that the core details of her story were corroborated by a variety of other witnesses at trial. Those corroborated details include victim's claim that her relationship with Petitioner was abusive; on the day of the crimes, Petitioner and Jackie took her to his apartment; Petitioner threatened to kill her unless she gave him her money; and, before falling asleep, Petitioner told Jackie to bind the victim's wrists and ankles with tape.

For example, Diana Miller corroborated the victim's account that Petitioner had been abusive. Miller told the jury that she had personally seen bruises from prior times when Petitioner struck the victim. R151:192, 202. Miller also confirmed that Petitioner's abuse had

begun when the victim received her $26,000 payment, as well as that Petitioner had repeatedly tried to get the victim to give him all her money. R151:193-95.

Though Jackie's testimony differed from the victim's, the two agreed on important points: Jackie confirmed that Petitioner was upset that the victim got a new boyfriend. R151:105. She confirmed that the victim had been "scared" to go to Petitioner's apartment on the day of the crimes without someone else coming along. R151:110. She confirmed that once there, Petitioner was "mad" at the victim and threatened to burn her with a cigarette. R151:117. She confirmed that Petitioner said "that bitch likes to run," and Petitioner had also said that the victim might "wander off in the night." R151:118. And she confirmed that she complied with Petitioner's direction to bind the victim's wrists and ankles with duct tape. R151:119.

Moreover, Detective Gordon testified that when she spoke to Jackie shortly after the incident, Jackie said that Petitioner was "f-ing with the bitch" and "scaring her" at the apartment that night. R152:126. Jackie also told the detective that Petitioner wanted the victim's money, Petitioner "wanted her hurt" because she was giving money to other people, and Jackie thought that Petitioner would have killed the victim that night if Jackie had not been there.  R152:134-36.

The two officers who testified specifically confirmed the victim's account of her condition that night. Officer Folau said the victim was not only crying, but seemed "scared." R151:59. And Detective Gordon said that the victim seemed "terrified" and "shell shocked." R152:114.

Significantly, the detective also testified that the victim did not seem crazy when the two spoke a few hours after the incident. According to the detective, the victim was "tracking and following appropriately" during the conversation, and gave answers that were both "consistent"

and "generally coherent." R152:121-22. While the detective was aware of the victim's "mental health issues," the detective did not think that those issues were impairing her as she recounted the night's events. R152:121-22.

And again, the jury apparently believed the victim even though it heard extensive testimony about her particular problems. For the same reasons counsel could reasonably forgo expert testimony about how drug abuse and mental illness affects a person's ability to perceive and retell events, adding it to the evidentiary picture would not have tipped the credibility balance in Petitioner's favor. It would have added little to the evidence about the victim's ability to perceive and recite events. But it would have added testimony the jury did not hear that the same impairments may have affected Petitioner's behavior and made him more likely to have been aggressive, paranoid, and violent on the day of the crimes.

In short, even if defense counsel had called an expert to testify that the victim's issues impaired her cognitive abilities--and even if that testimony had not simultaneously convinced the jury that Petitioner's own drug issues made it more likely that he could have actually committed this crime--there is still no reasonable probability that the testimony would have resulted in a more favorable result. And the reason for this is twofold. First, this jury already heard that the victim was a "crazy" drug user, but it decided to convict Petitioner anyway. And second, the victim's story was also corroborated by a variety of other witnesses. Petitioner therefore did not show that counsel's strategic decision to forgo expert testimony prejudiced him.

The court of appeals's opinion shows that the panel thoroughly reviewed the evidence and resolved the issue contrary to Petitioner. His disagreement with the court's evaluation does

not establish either that counsel fell below minimum professional standards, or that the court of appeals contradicted or unreasonably applied controlling federal law.

### c.      Merits-Review Summary

The court of appeals' ruling is entitled to "deference and latitude" in addition to that already "in operation when the case involves review under the *Strickland* standard," *Harrington, 562 U.S. at 101* (quotations and citation omitted), which is itself a highly deferential standard. *See id.* at 788. The state court, in fairly characterizing the evidence against Petitioner and evaluating trial counsel's performance in the face of that evidence, did not unreasonably apply the principles announced in *Strickland* or any other United States Supreme Court precedent. Petitioner cannot establish that the state court's determination was contrary to, or an unreasonable application of, clearly established Federal law.

Nor was the state court's conclusion "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C.S. § 2254 (d)(2)) (2017). Under § 2254(e)(1) "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id*. § 2254(e)(1). Petitioner has not done so.

### III. PETITIONER'S EXTRA-RECORD PROFFERS NOT CONSIDERED

Respondent objects to Petitioner's extra-record proffers of evidence and asks this Court to exclude those proffers from consideration. (Docket Entry # 18.) For the reasons articulated below, the Court sustains the objection and does not consider Petitioner's extra-record proffers.

Petitioner's response contains about eleven pages of proffered testimony from him, recounting his own version of the offense, investigation, and trial. (Docket Entry # 17.) Some of

his analysis also appears to contain non-record proffers. (*See, e.g., id.*)   (asserting Petitioner asked "trial counsel (Manny Garcia) to investigate [victim's] mental status and drug abuse"). Petitioner does not cite any record supporting his proffers and most of it appears to be new evidence not already in the state record. None of this evidence may thus be used to support Petitioner's habeas claims.

The Supreme Court has held that review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 180. "Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law." *Id.* "This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time--i.e., the record before the state court." *Id.*

Thus, to the extent Petitioner proffers evidence supporting his exhausted claims, those proffers may not be considered here because it would circumvent AEDPA's "purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Id.* To the extent Petitioner proffers evidence supporting his unexhausted claims, those claims are procedurally defaulted and barred from any consideration at all.

And Petitioner has neither asked for nor shown a basis entitling him to present new evidence under § 2254(e)(2), such as entitlement to benefit from "a new rule of constitutional law," or existence of "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C.S. § 2254(e)(2) (2017). Even if he had asked for

permission to present new evidence under this rubric, he would still have to show cause and prejudice for defaulting those same claims in state court. *Coleman*, 501 U.S. at 753. He has not shown that, nor could he, because his proffers are not based on a new constitutional rule or new evidence. Indeed, the proffers are all based on his own recollection of events, to which he had sole and privileged access during trial and could have presented if he wanted the evidence heard.

## IV. CONCLUSION

Having reviewed their merits under the federal habeas standard of review, this Court rejects ineffective-assistance-of-counsel claims one and two. Meanwhile, claims three through five are denied based on procedural default.

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus is DENIED. This case is CLOSED.

DATED this 21st day of March, 2017.

BY THE COURT:

_____
CHIEF JUDGE DAVID NUFFER
United States District Court